UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

IN RE BODIN OIL, Debtor      NO: 12-51540

SECTION: "S" (4)

ENVIRO CAP L.L.C.      CIVIL ACTION

VERSUS      NO: 16-887

BROWN & BROWN OF LA, L.L.C.      SECTION: "S" (4)

**OPINION**

This matter is before the court on appeal from the bankruptcy court's judgment entered on June 13, 2016, dismissing the claims of plaintiff/appellant, EnviroCap L.L.C., and intervenor/appellant Bodin Oil Recovery, Inc., against Brown & Brown, L.L.C. of Louisiana.[1] For the reasons which follow, the ruling of the bankruptcy court is AFFIRMED.

**BACKGROUND FACTS**

Appellant EnviroCap, L.L.C.'s ("EnviroCap's") principal business is factoring accounts receivable. It had entered into a factoring agreement with debtor, Bodin Oil Recovery, Inc. ("Bodin Oil"), secured by reclaimed oil which Bodin Oil was in the business of extracting and selling. In connection with their agreement, EnviroCap had made loans of $1,000,000 on June 2,

---

[1] Due to a judicial vacancy in the Western District of Louisiana, this matter was reassigned to the undersigned on July 26, 2018. Civil Action 16-887, Rec. Doc. 80.

2011[2] and $500,000 on July 27, 2011[3] to Bodin Oil and related entities known as the Triad entities.

In November 2011 and January 2012, Bodin Oil suffered losses to its facility. In Novermber 2011, a centrifuge used in Bodin's operations broke down. In January 2012, a heater fire damaged Bodin Oil's premises. The losses were insured by Contintental Casualty Company ("CNA"), Certain Underwriter's at Lloyd's of London, and AGCS Marine Insurance Company (among others), under policies purchased through Brown & Brown (hereinafter, "B&B"). The CNA policy covered both repairs and equipment as well as business interruption.

As of the date of the second loss, CNA had not begun paying insurance proceeds from the first loss. Concerned that payment of the claims would not be timely enough for Bodin Oil to maintain its operations, Bodin Oil president Scott Butaud approached EnviroCap principal Robert Beard regarding a bridge loan to keep operations going until the insurance payments were made. Essentially, EnviroCap would be fronting the insurance proceeds payments, to help keep Bodin Oil afloat until the insurance payments were disbursed.

In a January 17, 2012 letter to Butaud, Beard set out a proposed bridge loan structure that

---

[2] The following were listed as co-borrowers under the June 2, 2011 note: Bodin Oil Recovery, Inc., Triad Recycling, LLC ("Parent"), Gulf Coast Frac Tanks, LLC, Action Oil Recovery, Inc., LA Filter Recycling, LLC, and B&B Fire and Safety Services, Inc. Trial Exh. T-43B.

[3] The following were listed as co-borrowers under the July 27, 2011 agreement: Triad Response Group and each of its wholly-owned affiliates consisting of: Triad Emergency Response, LLC, Triad Fire and Safety, LLC, Triad Equipment LLC, Triad Recycling, LLC (and its wholly-owned affiliates consisting of Bodin Oil Recovery, Inc., Gulf Coast Frac Tanks, LLC, Action Oil Recovery, Inc., and LA Filter Recycling., LLC), and B&B Fire and Safety Services, Inc. Trial Exh. T-43I.

included potential advances of up to $750,000 for use to pay future oil deliveries.[4] The proposal included a requirement that EnviroCap be named loss payee on the business interruption policy. Beard explained that EnviroCap was requesting to be named as a loss payee, because "we will be advancing operational money now."[5] It also specified that at the time, the net value of the oil on site was $2,700,000, that Bodin Oil would assign its accounts receivable for the oil to EnviroCap, and upon collection of the receivables, EnviroCap would "re-advance additional funds for the following week's used oil purchases plus operating expenses until production of both the oil and Rag materials are fully operational."[6] It was hoped that the insurance company would make payments on the claims so the $500,000 from EnviroCap would not be needed.[7]

That is precisely what occurred. On January 17, 2012, Bodin Oil's insurers began paying on its claims.[8] Accordingly, the bridge loan to fund Bodin Oil's operations pending receipt of the insurance proceeds was never finalized. Between January 17, 2012 through May 23, 2012, CNA paid out $77,223 for repairs and $1,259,813 for business interruption losses. Aggregated with the payments of the other insurers, a combined total amount of approximately $1.4 million was paid by all carriers.

Despite the fact that the loan was never finalized, Butaud had contacted B&B and

---

[4] Trial Exh. T-4.

[5] Trial Exh. T-3.

[6] Trial Exh. T-4.

[7] Trial Exh. T-35.

[8] Trial Exhs. T-27, T-28.

requested that they name EnviroCap as a loss payee on the policies. B&B agreed, and subsequently, on January 20, 2012, B&B provided new property insurance certificates to EnviroCap reflecting that EnviroCap was a loss payee. The same day, EnviroCap followed up with B&B Vice President David Landry to confirm that it could not be removed as loss payee on the policies without EnviroCap's written consent.[9]

Subsequently it came to light that B&B had not followed through on making EnviroCap the loss payee. As a result, Bodin Oil affiliate and agent Triad Response Group ("TRG") remained as the primary insured under the policies. Insurance proceeds checks continued to be made payable to TRG. Butaud, who was president of both TRG and Bodin Oil (and in fact, president or controlling member of all the Triad entities), deposited the checks and allocated them as he thought appropriate, for example, to reimburse accounts that had been exhausted pending proceeds payments, or to pay for equipment repairs.[10]

On March 8, 2012, EnviroCap entered into a forbearance agreement with the Triad entities, including Bodin Oil, in which EnviroCap agreed to forbear from its rights under the June 2011 and July 2011 loan agreements. EnviroCap specifically agreed to "forbear in the exercise of its rights and remedies under the [June and July 2011 loan agreements]. . . with respect to the Defaults."[11] The March 2012 agreement formalized the parties' informal agreement, pursuant to which EnviroCap had forborne collecting from Bodin Oil or putting them

---

[9] Trial Exh. T-1.

[10] Trial Transcr. V.2, 146:2 et seq.

[11] Trial Exh. T-43E, p. 2.

4

in default since November 2011.

On December 14, 2012, Bodin Oil filed for bankruptcy. EnviroCap filed a proof of claim seeking approximately $1,159,913, which was outstanding as of the petition date.[12] In May 2013, EnviroCap settled its claim against Bodin Oil for $925,000.00.[13] According to EnviroCap, that left a $553,809.00 deficiency owed to it by B&B, comprised mainly of late fees and attorneys' fees related to EnviroCap's loan and claims.

To recover that deficiency, EnviroCap sued B&B in the instant adversary proceeding, asserting claims for detrimental reliance and negligence, and alleging that it detrimentally relied on B&B's representation that EnviroCap was a loss payee, and that B&B breached its duty to name it as loss payee on the policies. EnviroCap further alleged that if it had been named loss payee, EnviroCap would have used the insurance proceeds to pay off its loans to Bodin Oil, and would therefore have suffered no losses. Bodin Oil intervened, arguing that had B&B properly named EnviroCap as loss payee, the loans would have been paid off from the insurance proceeds, and it would not have had to pay EnviroCap $925,000.00 in compromise.

In response, B&B argued that (1) EnviroCap was not intended to be loss payee on Bodin Oil's insurance policies; (2) EnviroCap was contractually bound not to accept insurance proceeds under a forbearance agreement with Bodin Oil and others; and (3) EnviroCap failed to prove it

---

[12] Trial Exh. T-43.

[13] In the Settlement Agreement, EnviroCap specifically reserved its claims against all non-parties to the agreement (e.g., B&B). Trial Exh. T-49, p. 5, ¶ 10.

suffered any damages, because it was paid in full on the July 2011 loan, and the amounts claimed related to the June 2011 loan are late fees and attorneys' fees, which EnviroCap is not entitled to recover. B&B also argued that Bodin Oil failed to prove negligence or damages because it received all proceeds to which it was entitled.

Following trial, the bankruptcy court found that the record did not support EnviroCap's theory of claims for negligence and detrimental reliance. While the court determined that the naming of EnviroCap as loss payee was not conditioned on the finalization of the bridge loan, and that B&B had breached its obligation to do so, it also held that B&B's failure in this regard did not cause EnviroCap's damages. Noting that "[t]he crux of EnviroCap's damage claim is that [if] it had been named a loss payee, insurance proceeds total[ing] approximately $1.4 million would have flowed through EnviroCap and would have been applied to the outstanding loans," the bankruptcy court concluded, that for a number of reasons, the record simply did not support that conclusion.[14] To the contrary, the bankruptcy court found that absent a default, the applicable loan and security agreement "did not provide EnviroCap with grounds to take the step that was the linchpin of its damage claim – applying the proceeds of the insurance claims to the outstanding loans." This is because the record reflects that from November 2011 through March 2012, EnviroCap and the Triad companies had agreed to an informal forbearance, formalized in March 2012, which prohibited EnviroCap from exercising default remedies and applying any funds it would or could have received from the insurance proceeds to the loan. Put another way, to take the step described with respect to the 2011 loans, EnviroCap would have had to put the

---

[14] Ruling Transcr., 12:8-12.

Triad companies in default, and during the period the insurance proceeds were being paid out, it was contractually prohibited from doing so, and in fact, did not do so until November 2012.

The bankruptcy court also found that the record did not support the contention that even if EnviroCap had received the insurance proceeds, it would have applied them to its loans. The court first noted that the loss payee status was originally proposed so that the proceeds would protect the bridge loan, which never occurred. However, as the bankruptcy court noted, the insurance proceeds were specifically designated to fund ongoing operations and repairs, not to pay off loan balances.

The bankruptcy court also noted, with respect to EnviroCap's suggestion that the loan proceeds would have enabled it to achieve its objective of "getting out of the deal" with Bodin Oil, that that notion is belied by the fact that EnviroCap entered into a new factoring agreement for up to $9,000,000 in March 2012, and extended a new bridge loan to Bodin Oil in November 2012. Rather, the bankruptcy court noted that the record reflects that EnviroCap had every intention of continuing to do business with Bodin Oil, and that it was always EnviroCap's intent to look to the Bodin Oil reclaimed oil inventory as collateral for its loans. Further, EnviroCap did not raise the loss payee issue until it learned the collateral had been compromised. In sum, the bankruptcy court found that EnviroCap could not establish that B&B's actions were the cause in fact of any of EnviroCap's losses, and that Bodin Oil's intervention claim was derivative of EnviroCap's, and failed for the same reason.

Following entry of judgment in favor of B&B, EnviroCap and Bodin Oil filed timely appeals, and B&B cross-appealed.

**ASSIGNMENTS OF ERROR**

EnviroCap argues that the bankruptcy court erred in following particulars: (1) finding that the forbearance agreement foreclosed recovery of insurance proceeds; and (2) finding that EnviroCap would not have applied the insurance proceeds to the indebtedness.[15]

Bodin Oil argues that the bankruptcy court erred in the following particulars: (1) finding that the conduct of B&B caused no damages to EnviroCap and Bodin Oil; (2) finding that the contracts precluded EnviroCap from liquidating Bodin Oil's debt; (3) finding that EnviroCap's continuous dealings with Bodin Oil precluded liquidation of Bodin Oil's debt; (4) finding that EnviroCap did not intend to apply payments to the Bodin Oil debt; and (5) considering and applying unpled affirmative defenses.

Citing an abundance of caution, B&B filed a cross-appeal to preserve its right to argue that there were additional bases and/or reasons upon which the bankruptcy court could have reached the same ruling and to cross-appeal certain adverse findings or conclusion in the event all or part of the bankruptcy's judgment is reversed.

**STANDARD OF REVIEW**

District courts of the United States have jurisdiction to hear appeals from orders of the bankruptcy court. See 28 U.S.C. § 158(a). The court reviews factual findings for clear error, and conclusions of law de novo. In re Cueva, 200 F. App'x 334, 335 (5th Cir. 2006). Matters left to the bankruptcy court's discretion are reviewed for abuse. Id. (citing Century Resources Land

---

[15] Originally, EnviroCap also argued that the bankruptcy court had erred in finding that the November 14, 2012 bridge loan was never finalized, but it withdrew that assignment of error.

8

LLC v. Adobe Energy Inc., 82 Fed App'x 106, 110 (5th Cir. 2003).

## APPLICABLE LAW

EnviroCap's claims are based on negligence and detrimental reliance. Bodin Oil's claim is derivative of EnviroCap's and is the result of legal subrogation.[16]

*Negligence*

Under Louisiana law, to prevail on a claim for negligence, the plaintiff must prove: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). Lemann v. Essen Lane Daiquiris, Inc., 923 So. 2d 627, 633 (La. 2006) (citing Fowler v. Roberts, 556 So.2d 1, 4 (La.1989)). A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. Mathieu v. Imperial Toy Corp., 646 So. 2d 318, 321 (La.1994).

*Detrimental Reliance*

---

[16] See 13-AP-5029 (W.D. La.), Rec. Doc. 173, at 4. On appeal, Bodin Oil argues that its claims arise from a *stipulation pour autrui*. The court has reviewed Bodin Oil's intervention petition, and notes that it did not specifically identify the causes of action against B&B, and that it makes no reference to a breach of contract claim or a *stipulation pour autrui*. Moreover, in its motion for summary judgment, it specifically designated its claims as being for negligence as a result of legal subrogation. That is how they were analyzed by the bankruptcy court and this court agrees. The court observes, however, that even if Bodin Oil's claims were contractual, actual damages caused by the breach must be shown, which has not occurred in this case.

9

The doctrine of detrimental reliance is provided in Louisiana Civil Code article 1967, which states:

> Cause is the reason why a party obligates himself. A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

There are three elements required for the application of detrimental reliance: (1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance. Morris v. Friedman, 663 So. 2d 19, 25 (La.1995). "[T]he basis of detrimental reliance is 'the idea that a person should not harm another person by making promises that he will not keep.'" Suire v. Lafayette City–Parish Consol. Gov't, 907 So. 2d 37, 59 (La. 2005). "Thus, the focus of analysis of a detrimental reliance claim is . . . whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment." Id.

## DISCUSSION

All of the issues raised on appeal can be resolved in the disposition of Bodin Oil's first assignment of error. If, as the bankruptcy court found, the conduct of B&B was not the cause-in-fact of EnviroCap's and Bodin Oil's alleged damages, they are not entitled to recover from B&B.

*1.  Defendants have not established that B&B's breach was the cause-in-fact of their alleged damages*.

The bankruptcy court determined that the record established that EnviroCap should have been designated as loss payee and that B&B failed to do so as promised, and that but for that

failure, EnviroCap would have been listed on the insurance proceeds checks as an additional payee. However, as noted by the bankruptcy court, "EnviroCap's theory of damages requires the additional step that EnviroCap would have used those insurance proceeds to pay down the outstanding balance of its loans to Bodin and the Triad entities, and would have"[g]otten out of the deal."[17] The bankruptcy court concluded, as a matter of fact, that the record did not support a link between B&B's conduct and EnviroCap's losses. To the contrary, the bankruptcy court found that the record reflected that the insurance proceeds were used as the parties expected that they would be used, and EnviroCap's damages were the result of Butaud's failure to direct the proceeds from the oil inventory, which collateralized EnviroCap's loans, to EnviroCap.

The court finds that the bankruptcy court was not clearly erroneous in its factual finding that the record does not support the conclusion that the monies would have been applied against the loans, and extensive record evidence supports this finding.

The correspondence between the parties reflects the understanding that the proceeds would be used for amelioration of business losses and equipment repair needed due to the centrifuge failure and the fire. It is for this reason that EnviroCap contemplated extending a bridge loan pending the insurance proceeds payout, and for this reason that the parties abandoned pursuing the bridge loan once proceeds payments began.

Specifically, when discussing the possibility of a bridge loan in the range of $500,000 to $750,000 to fund Bodin Oil's ongoing operations pending disbursement of the insurance proceeds, and the concomitant designation of EnviroCap as loss payee, correspondence between

---

[17] Ruling Transcr., 18:11-17.

11

Beard and Butaud reflects their understanding that the insurance proceeds received from the business interruption coverage would be used not to pay down the prior loan balance, but to fund Bodin Oil's ongoing operations so that a bridge loan would not be necessary. In an e-mail dated January 25, 2012 from Butaud to Beard, Butaud informed him that he was "pressing the insurance company to send money asap to hopefully keep us from needing to use the 500K."[18] Beard responded explaining that approval of the $500,000 bridge loan was still in process, but it would be "best for all concerned" if the insurance proceeds came through, obviating the need for the bridge loan.[19] The obvious import of this exchange was that all parties expected that the insurance money would be applied towards Bodin Oil's ongoing operations, because if the insurance money came through, the bridge loan for ongoing operations was unnecessary.

Likewise, the record reflects that Beard acknowledged that proceeds received for covered equipment losses, were in fact used for repairs, not to repay prior loan balances.[20]

The record also reflects that during the period that TRG received the insurance checks, and up until November 2012, EnviroCap considered Bodin Oil's oil inventory as the source of repayment for its prior loan balances, not the insurance proceeds. In a November 8, 2012 e-mail to Butaud, Beard acknowledged that his loan was "[s]ecured primarily by the ragoil and the plan for the last year was to get us whole -- to get us whole by selling that rag."[21] In fact, it was only

---

[18] Trial Exh. T-35.

[19] B&B Exh. 85 (Rec. Doc. 61-12).

[20] Trial Transcr. Vol. 1, 68:7-69:2.

[21] Trial Exh. T-41.

12

after EnviroCap's November 2012 discovery that the oil inventory had been sold by Butaud, and the proceeds not used to pay down the outstanding balance owed to EnviroCap, that EnviroCap began its inquiry into its loss payee status with B&B.[22] Subsequently, EnviroCap, through Beard, confirmed that the relationship failed in part due to "[t]he sale of oil to Cox for 1.2 million that was EnviroCap's collateral and that had always been ear-marked for paying us out and the fact that we did not receive one penny."[23] The record, including Beard's testimony, firmly establishes that "we (EnviroCap) were always looking at that oil inventory to be our primary source of repayment."[24]

Second, as the bankruptcy court correctly noted, during the period in which the insurance proceeds were paid out, EnviroCap was operating under a forbearance agreement that prevented it from taking the insurance proceeds. Because this conclusion requires resolution of the legal issue of whether the forbearance agreement was valid and in force at the relevant time, the court has reviewed it de novo.

By their terms, the loan agreements and forbearance agreement are governed by Florida law. The loan agreements provide that a modification is effective if it is "in writing and signed on behalf of Lender or Lender by a duly authorized officer of Lender. . . ."[25] Under Florida law, which the parties do not dispute is applicable, "an electronic signature may be used to sign a

---

[22] Trial Exh. T-11, T-12.

[23] Trial Exh. T-46.

[24] Trial Transcr. Vol. 1, 96:1-4.

[25] Trial Exhs. 43F and 43I at §8.17.

writing and shall have the same force and effect as a written signature." Fla. Stat. §668.004.

The record reflects that from November 2011 through March 17, 2012, EnviroCap agreed to forbear from exercising its rights and remedies while the parties negotiated a formal forbearance agreement, which was formalized in March 2012. As acknowledged by Beard in his February 9, 2012 correspondence to Butaud, "[w]e [EnviroCap] have unofficially "forbeared" for over 3 months as principal repayments were supposed to start on November 1."[26] The March 2012 agreement reflected that the forbearance would be extended until June 2012. Thus, the forbearance was in continuous effect from November 2011 through June 2012 (and then extended until November 2012, when EnviroCap finally put Bodin Oil in default).[27] It was thus in force at the time insurance proceeds payments were made to TRG.

In arguing against this conclusion, EnviroCap suggests that the forbearance agreement was void,[28] because at the time of the insurance payments, Bodin Oil was already in default of the forbearance agreement, due to Butaud's misrepresentations to EnviroCap that no insurance

---

[26] Trial Exh. T-38.

[27] Trial Exh. T-45.

[28] EnviroCap also argues for the first time on appeal that the bankruptcy court erred in considering the forbearance agreement because in doing so, it supplied B&B with an unpled affirmative defense. In addition to the fact that the bankruptcy court analyzed the agreement not as an affirmative defense, but rather as evidence that EnviroCap could not have applied the funds as it now says it would have, the court also notes that the forbearance agreement arguments were extensively litigated in summary judgment motion practice and in the trial of this matter, and EnviroCap not only did not object on the grounds that it was an unpled affirmative defense, but also introduced the forbearance agreement and related emails during the trial. "Failure to raise an argument before the [lower] court waives that argument." Fruge v. Amerisure Mut. Ins. Co., 663 F.3d 743, 747 (5th Cir. 2011).

14

proceeds had been disbursed. However, the record contains extensive evidence to the contrary, including Butaud's testimony that he discussed the proceeds checks with Beard,[29] e–mail from Butaud to Beard referencing the receipt of insurance payments,[30] correspondence from *Beard* stating that the insurance company indicated they were going to pay for repairs,[31] and significantly, the fact that Butaud provided Beard with David Landry's contact information so that Beard could reach out to the insurance agency and follow up on the status of the payments himself,[32] as well as that of the CNA claims underwriter (who Beard spoke to once, but never followed up with regarding proceeds payments).[33] Moreover, apparently Beard had remote access to the Triad entities' accounts, and could check at any time on deposits and balances.[34] On these facts, the court finds that EnviroCap knew about and tacitly approved the payments to TRG.

EnviroCap points to Beard's testimony that if received, he would have applied the insurance proceeds to the loans. EnviroCap argues that such testimony was uncontradicted in the

---

[29] Trial Transcr. V.2, 151:1-5, 152:2-13.

[30] B&B Exh.78 (Rec. Doc. 61-22).

[31] Trial Exh. T-4. Notably, in this same letter from Beard to Butaud acknowledging the forthcoming insurance proceeds payments, Beard also acknowledges that "the collateral/security for EnviroCap's loan is essentially the Rag inventory. . . ." Id. Thus, this single piece of correspondence, drafted by Beard, significantly undermines EnviroCap's argument that it did not know of the insurance proceeds payments and intended to use them to pay down its loan.

[32] Trial Exh. T-2.

[33] Trial Transcr. V.1, 71:14-72:20.

[34] Transcr. V. 2, 174:12-175:10.

record. To the contrary, the record is replete with evidence that belies his testimony. The bankruptcy considered all of the evidence, including Beard's testimony, and determined that was not his intention. The bankruptcy court directly addressed Beard's testimony that EnviroCap would have used the proceeds and "get out of the deal," and explicitly rejected it as not supported by the record.[35] The bankruptcy court, as the trier of fact who had the opportunity to personally observe all of the testimony, was unpersuaded by Beard's testimony on that point. This court finds that the bankruptcy court's credibility call was not clearly erroneous.

## 2. *Plaintiffs have failed to prove that they suffered damages as a result of B&B's actions.*

The bankruptcy court also concluded that plaintiffs had failed to prove that they suffered any damages, an essential element of their claims, as a result of B&B's actions. EnviroCap's June 2011 loan was paid off in full,[36] and in addition, EnviroCap received $925,000 in settlement for its other claims.[37] Thus, EnviroCap was required to establish that it would have received insurance proceeds in excess of $925,000 to apply against the July 2011 loan.

As the bankruptcy court found, the record simply does not support that conclusion. To the extent a portion of the proceeds would have been used to pay down EnviroCap's loans, the exact amount that would have been applied is purely speculative. If B&B had named EnviroCap loss payee, the insurance proceeds checks would have been made payable to both EnviroCap and

---

[35] Ruling Transcr.,16:4-7, 18:18-25.

[36] Trial Exh. T-40. At trial Beard acknowledged that as of June 21, 2012, the $500,000 loan was paid off. Trial Transcr. V.1, 94:18-20.

[37] Trial Exh. T-49.

16

TRG. The CNA policy specifically stated, "We will pay **you and the loss payee** shown in the declarations for a loss to a breakdown to covered equipment as interest may appear."[38] Likewise, the June 2011 loan agreement similarly provides that any insurance policy covering EnviroCap's tangible collateral, "[s]hall be payable **to borrower and lender** as their respective interests may appear."[39] Thus, even if it were named as loss payee, EnviroCap would not have had the unfettered capacity to direct 100% of the insurance proceeds to pay down the loans. Any suggestion of an amount that would have been applied is pure speculation, and no evidence was submitted at trial on this point. Accordingly, EnviroCap has failed to establish its damages in this case.

Bodin Oil's derivative claims fail for the same reasons EnviroCap's claims fail. Bodin Oil's argument is based on the notion that its $925,000 settlement payment would have been unnecessary if EnviroCap would have been loss payee. However, as previously stressed, the record does not reflect that the parties intended that the insurance proceeds would be used to pay down the EnviroCap loans, and even if some amount had been applied against the loans, that amount is purely speculative, and thus the amount Bodin Oil would have had to pay in settlement is also speculative.[40]

---

[38] B&B Exh. 18 (Rec. Doc. 58-11) (emphasis added).

[39] Trial Exh. T-43, §5.6 (emphasis added).

[40] As well, arguably, Bodin Oil *did* receive the insurance proceeds, because Bodin Oil is a wholly-owned affiliate of TRG, and Butaud, president of both TRG and Bodin Oil deposited the checks and used them as needed for Bodin Oil's operations and equipment repair. Considered in this light, an award to Bodin Oil would amount to a double recovery,

17

## CONCLUSION

EnviroCap's claims, for negligence and detrimental reliance, and Bodin Oil's negligence/subrogation claims, require a showing that B&B's negligence was the cause-in-fact of proven damages. The bankruptcy court correctly concluded that neither was proved in this case. Therefore, the court does not reach B&B's cross-appeal, which was filed to preserve its rights in the event all or part of the bankruptcy's judgment was reversed. Accordingly,

**IT IS HEREBY ORDERED** that the judgment of the bankruptcy court is **AFFIRMED;**

**IT IS FURTHER ORDERED** that the cross-appeal filed by Brown & Brown of Louisiana, L.L.C. is **DISMISSED as moot.**

New Orleans, Louisiana, this  12th  day of June, 2019.

**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**